By the Court—Bosworth, Ch. J.
The Judge, before whom this action was tried, instructed the jury, inter alia, that the *262 plaintiff’s “complaint is upon the policy, as altered. That the plaintiff’s right to recover depends upon the question whether the agent had authority to alter this written instrument. The plaintiff does not claim that the agent had, originally, any authority * * * to alter policies which the Company issued. The question, then, depends on this, whether McLimont was permitted to alter policies in respect to dates of sailing, from time to time, and the Company sanctioned it, so that that became the customary usage and course of business.”
“ This case, as before stated, turns upon the question, whether McLimont had authority to make the alteration.”
If the evidence given does not justify the inference, or conclusion that “ McLimont was permitted to alter policies, in respect to dates of sailing, from time to time, and the Company sanctioned it, so that that became the customary usage and course of business,” the verdict should be set aside and a new trial granted. The rights of suitors cannot be protected, unless the party against whom a verdict has been rendered, can, on a, motion to set it aside as contrary to law and evidence, be secured a just and firm application of the rule which, at the trial, he insists the jury should be instructed to apply, and which, in conformity to what he claims to be the law, they are instructed to apply to the facts they may find.
If, on a fair application of the law, which the jury were instructed to obey, he was entitled to a verdict, the verdict, if against him, should be set aside. If the law, as he insisted it should be stated in the charge of the Judge to the jury, had been stated differently, it would have been his right to except to the ruling, and if erroneous, his exception would secure to him a new trial.
Assuming it to be true that the instructions given were proper, and such as the defendants, on the trial of this action had a right to demand, and that, under the instructions given, the verdict of the jury should have been in their favor, and the verdict rendered against them is clearly against evidence, yet if a new trial be refused, on the idea that the plaintiff has some equity superior to the defendants’ clear legal right, they are remediless. An appeal to the Court of Appeals can be of no service. The jury were correctly instructed as to the law, and that Court will not inquire whether there was any evidence to warrant the verdict. *263 If it be supposed that the plaintiff ought to recover on some equitable grounds, notwithstanding the right of the defendants to a verdict in this action, on the pleadings, as they stand, and on the evidence given at the trial, which has been had, and assuming the law to be, as the Judge in his charge instructed the jury it was, the defendants should at least have a chance to litigate this supposed equitable right in some action in which it is asserted prior to the trial, and upon pleadings which at least intimate the existence and nature of the supposed equitable right, and an intention to assert and enforce it.
We think, therefore, that unless the evidence warranted a verdict in favor of the plaintiff, upon the only .question submitted to the jury, a question on the proper determination of which, as they were instructed, the, right of. the plaintiff to recover alone depended, the verdict should be set aside and a new trial granted. ■ g
That the policy had been altered, after it had been issued by the defendants and delivered to the plaintiff, and that it had been so altered without any authority from the Company, and without their consent, and without any knowledge thereof on their part until a claim for a loss was presented under such policy, was set. up in their answer, as a defense, and such allegations were at issue upon the pleadings.
The letter of the 14th of December, 1854, authorized the agent to take risks upon “cargoes of lumber (from) Quebec to Great Britain and Continent of Europe,” at a “tariff of rates ” which he had presented to the Company and which the latter had approved. The letter of the 7th of July, 1855, in clear terms denies to kim the power to take other risks. Those rates, on vessels or cargoes- sailing before the 10th of October were 3 per cent, and after the 10th and on or before the 15th were 3-| per cent, and on and after the 15th and before the 25th, 4 per cent. So the agent testifies. The Secretary of the Company testifies that it was 4 per cent after the 10th until the 20th.
The policy in question, in and by which, as originally issuéd, the vessel was warranted to sail on the 10th of October, 1855,' states the sum insured to be $4,510, the premium $135.30, and the policy $1.25, or, in other words, insures at the rate of 3 per cent.
*264 By the contract as altered, the vessel was warranted to sail on the 15th, and might and did sail after the 10th. And by its terms, as thus altered,-the Company took the risk and agreed to be responsible for the losses against which it insured, at 8 per cent. The written authority of the agent, by its terms, declares that, “ on all risks and amounts on risks, other than the amounts and risks which you are therein, (viz.: in the letter of December 14, 1854,) authorized to take, you are hot empowered to bind us, but they must first be submitted to us for our approval and sanction.”
His written authority, it is quite clear, did not authorize him to make such a contract, as the written policy, as altered by him, is, at the rate of premium therein expressed.
Was he allowed to make such alterations in policies that had been issued by the Company, and did the Company, knowing that he had done so, acquiesce in such acts, so that that became the customary usage and course of business ?
The agent swears that he was, and specifies as instances the ship Eleanor, from Quebec to Great Britain; the ship Tchernaya, and the ship Caledonia, from Ristigouch to Great Britain.
The alterations made in the policies of those three vessels were communicated by the agent to the Company. In the case of the Eleanor, the day of sailing was altered and an additional premium charged, and the Company sanctioned it.
In the case of the Tchernaya, the policy, as issued, was on the vessel, and included launching. In the case of the Caledonia, the time to sail was enlarged twenty-four hours.
There is no proof of a single case where such an alteration was made, and there was a subsequent loss, followed by payment by the Company of the sum insured, without the fact of such alteration having been made, being previously communicated to the Company and approved by them.
The evidence shows that the Company frequently assumed to decline risks which he had taken or proposed to.take; as withholding a policy on the Caledonia, until informed that she sailed before the 10th of August, 1855, unless an increased premium was paid. So in reducing the amount insured on Wm. McLimont’s policy, and increasing the rate (September 12, 1855); so in declining an alteration in the policy of the “Northern Belle,” *265 (August 3,1855,) so in declining a risk on the “ Earitan,” (October 6; 1855,) so in “ declining the Splendid and refusing to sanction extension of Lucien,” by letter of the 19th of November, 1855, a date prior to the time when the defendants are shown'to have had notice or reason to suspect that the policy in question had been altered.
The officers of the Insurance Company deny, in their testimony, that the agent was ever allowed to alter policies so as to bind the Company, without their sanction of the act, or that any case occurred in which he altered the time of sailing specified in a policy after it was issued, and that they acquiesced in it, or paid a loss under it, when the fact of such alteration had not been previously communicated and expressly approved.
The policy in question is the first policy which the insured is proved to have effected with this Company. His son, who applied for it in his behalf to the agent, had no previous acquaintance with him, and had never seen him until he made such application-
The applicant did not, therefore,- rely upon the sanction by the defendants of previous similar act's of the agent, in respect to policies issued by them to the insured, in asking the alteration and in relying upon the altered policy as an authorized contract of the defendants:
To justify a jury in-finding the affirmative of the question which was submitted to them as the turning point in the controversy, the evidence should show, if not a succession, at least several cases, in which the agent, without asking the sanction of his acts by the Company, had made alterations of a like nature, on which the Company had acted and in which they had acquiesced when such alterations came to their knowledge without having been previously communicated by the agent, or the evidence should be such as would tend to prove that, although communicated by the agent, they were acquiesced in as acts, which he was competent to perform, and as binding on the Company.
Evidence short of this cannot justify the conclusion that the agent did alter policies, from time to time, with the sanction of the Company, so that the exercise of such authority by him “became the customary usage and course of business.”
And we think it may be safely affirmed that the agent, in no instance prior to this, was permitted to alter, or to the knowledge *266 of the Company had altered a policy that had been issued by the Company to the insured, so that it became in terms a contract which, originally, he had no power to make. If, as altered, the risk was increased, and by the rules of the Company entitled them to a larger premium than that for which, by the policy, they agreed to be liable, there should at least be some evidence that such an alteration had been sanctioned either expressly by the Company, or by their acquiescence in it.'
This action is brought upon the policy, as being, as it now reads, a valid contract of the Company. The agent never had authority to make such a contract, and clearly he had no authority to alter a written contract of the Company and conyert it into a contract which he had no power to make, if .none had been executed by the Company.
A new trial should be granted, with costs to abide the event.
Ordered accordingly.